## McAllister's Dairy Farms, Inc., v. Henning

*Bailey & Rupp,* for plaintiff.

*John L. Sullivan,* for defendant.

SOHN, J., July 22, 1957.—We have before us an application for a preliminary injunction. Plaintiff, McAllister's Dairy Farms, Inc., seeks to enjoin defendant, Hon. William L. Henning, Secretary of the Department of Agriculture of the Commonwealth of Pennsylvania, from enforcing the provisions of the Act of July 2, 1935, P. L. 589, 31 PS §646, and from attempting to prevent the sale of plaintiff's ice cream and sherbet at retail in the Commonwealth of Pennsylvania.

Another prayer of the petition for the preliminary injunction is that this court declare section 2 of the Act of July 2, 1935, P. L. 589, 31 PS §646, to be inapplicable to plaintiff, which holds an ice cream license issued by the Department of Agriculture, pursuant to section 6 of the Act of May 20, 1949, P. L. 1594, 31 PS §412.

From the testimony taken, it clearly appears that plaintiff has had a license to sell ice cream under the provisions of the Ice Cream Law of 1949 ever since the year 1953 to the present time. During those years, it has sold ice cream regularly in the State of Pennsylvania. Plaintiff is a corporation, with its principal place of business in Ohio, and its principal outlets in Pennsylvania are in Sharon and Meadville, and also an outlet store in New Castle, the latter being known as a "franchise" store which handles plaintiff's milk products exclusively. The stores in Sharon and Meadville are company-owned stores. There is no question but that plaintiff is doing quite an extensive ice cream business through these three Pennsylvania outlets. The president of plaintiff-corporation admitted that his corporation does not presently have a milk products permit issued by the Commonwealth of Pennsylvania under the provisions of the Milk Products Law of 1935. He admitted also that the company once had a milk products permit under the Act of 1935, but that it was not renewed after the year 1955. He said that the reason that they did not renew it was because the Department of Agriculture had canceled their source of supply in Ohio. Although he testified that he did not believe that it was necessary to have a milk products license under the Act of 1935, since he had an ice cream license under the Act of 1949, he must have been aware of the necessity of a milk products license under the Act of 1935 for the reason that he had already had one.

On March 7, 1957, Mr. McAllister, plaintiff's president, received a letter from Howard K. Johnson, of the Department of Agriculture, advising that it was necessary to have a permit for the sale of milk products from the Division of Sanitation, in addition to the permit granted the company under the Act of 1949 relating to the sale of ice cream. After receiving this letter, the company did nothing whatsoever toward get-

ting a milk products permit. On or about July 1, 1957, one Robert Stratton, Jr., an inspector from the Department of Agriculture, called upon the store manager of the plaintiff at Meadville. He ordered the store to stop selling ice cream on July 8, 1957, and informed them that because they did not have a milk products permit, any personnel in the store who sold ice cream or ice cream products after July 8, 1957, would be prosecuted. Since that time no ice cream has been sold in any of the three Pennsylvania stores. On July 5, 1957, Mr. McAllister came to Harrisburg and learned from Mr. Paul M. Richards of the Division of Milk Sanitation that the reason they had been told to stop the sale of their ice cream products was because they did not have a milk products permit pursuant to the provisions of the Act of 1935. On July 9, 1957, an application for a milk products permit was executed and filed with the Department of Agriculture, but up to the present time no license has been issued because plaintiff had found no Pennsylvania approved source of supply. As bearing on the source of the milk and cream used in the manufacture of the ice cream sold by plaintiff in Pennsylvania, we have the following testimony:

"Q. Where do you obtain the milk that is used in your ice cream?

"A. Right at the present time we get it from the Wayne Co-operative Milk Producers Association, Inc., in Fort Wayne, Indiana. That is the fluid cream.

"Q. And do you also obtain from the same source the fluid cream which you sell to your wholesale and retail customers?

"A. Yes, we do.

"Q. What is the total volume of milk you get from the Wayne Co-operative of Indiana for all purposes?
"A. It is by the week.

188

"Q. Well, how much a week?

"A. Around forty thousand gallons, I would say weekly, which would make somewhere around twenty million gallons a year.

"Q. Is that for all purposes, or just for ice cream?

"A. That is for all purposes.

"Q. Is Wayne Co-operative approved as a milk supplier by the Pennsylvania Department of Agriculture?

"A. I understand their permit was canceled.

"Q. Have you been in touch with the officials at Wayne Co-op about your obtaining approval as a Pennsylvania supplier?

"A. Yes, I have.

"Q. So far as you know what are their intentions?

"A. They intend to get approved; have been intending to get approved.

"Q. If Wayne Co-op does not get approved, would it be possible for you to obtain milk from an approved source?

"A. Well, I think that would be true, but not immediately."

It thus appears that at the present time plaintiff has no approved source for the milk and cream which goes into the making of ice cream to be sold in Pennsylvania.

John L. Sullivan, Deputy Attorney General of the Commonwealth of Pennsylvania, representing defendant, stated for the record that there was no question but that petitioner is in complete compliance with the Ice Cream Act of 1949. It is the Milk Sanitation Law of 1935, according to him, which has not been complied with by plaintiff. All of the ice cream manufactured by plaintiff is manufactured in the State of Ohio.

The Act of July 2, 1935, P. L. 589, sometimes known as the Milk Sanitation Act, is entitled:

"An act to safeguard human health and life by providing for the issuance of permits to, and regulation of

persons and entities selling milk and milk products; conferring powers, and imposing duties on the Secretary of Health, the Advisory Health Board; and otherwise providing for the administration of the act; and imposing penalties."

It is a comprehensive act and in detail regulates milk and milk products from the time the milk leaves the cow, down to and including its final consumption by the purchaser. Among its various definitions, we find:

" 'Milk products' means ice cream, ice cream mix, custard ice cream, french ice cream, frozen custard, and other similar frozen products, and all dairy products used in the manufacture thereof."

Section 2 thereof provides:

"Section 2. Except as hereinafter provided, no person shall sell milk or milk products within this Commonwealth without first having obtained a permit from the 'secretary,' nor otherwise than in accordance with the requirements of this act. Each person desiring a permit to sell milk or milk products shall annually make an application therefor on a form to be secured from the 'secretary'. . . ."

The form of the application is then set forth in detail. It provides further:

"Permits shall be issued only to persons, whose entire milk supply, the farms, where it is produced and the milk plants in which the milk or milk products is handled, have been approved by the secretary, and in any case in which, in his discretion, he shall deem such action necessary for approval, inspected by the secretary. Every permit shall expire annually."

Section 20 of this act provides for various penalties which shall be collected for each individual offense.

The Ice Cream Act of May 20, 1949, P. L. 1594, is entitled:

"An act for the protection of public health and to prevent fraud and deception in the manufacture, sale, offering for sale, exposing for sale, and possessing with intent to sell, of adulterated or deleterious ice cream, french ice cream, french custard, frozen custard, frozen ice confections, frozen sherbet confections, sherbet, ice and fruit ice, including coated ice cream and the coating thereof; fixing standards for ice cream, custard ice cream, french ice cream, french custard, including sherbet, frozen ice confections, frozen sherbet confections, frozen dairy confections, ice and fruit ice, and to prevent the sale of imitation ice cream and defining said imitation ice cream; providing for licensing; conferring powers and imposing duties upon the Department of Agriculture; prescribing penalties; and providing for the enforcement thereof."

A reading of this act discloses that it likewise is for the protection of the public health and to prevent fraud. It is under the provisions of this act that plaintiff contends he thought it was unnecessary for his company to have, in addition, a permit or license under the Act of 1935. We do not so understand the law. A careful reading of these two acts must lead to the inevitable conclusion that they are "pari materia" and must be read together. They have both been passed by the legislature for the protection of life and the general health of the public and to prevent fraud. Our Statutory Construction Act of May 28, 1937, P. L. 1019, art. IV, sec. 62, provides:

". . . Laws in pari materia shall be construed together, if possible, as one law."

This is especially necessary in this case. Ignorance or misunderstanding of the law can avail plaintiff nothing. Plaintiff here cannot plead ignorance of the law, for it had operated under the Act of 1935 and had a permit under the Milk Products Law. It was advised the same day it secured an ice cream permit that it was

necessary also for the company to secure a permit to operate under the Milk Sanitation Law of 1935. This it secured as it was advised. The 1935 permit it abandoned apparently, in 1955, when it had difficulty with the Commonwealth of Pennsylvania, and for the reason as Mr. McAllister testified:

",A. They had canceled our source of supply and I guess that was the main reason. We did not have a source of supply that conformed and approved and they were trying to get it approved, so we expected to apply immediately as soon as they were approved."

However, it was not until July, 1957, that plaintiff filed an application for such a permit.

The plaintiff has referred to the provision in the Act of May 20, 1949, P. L. 1594, sec. 10, as amended by the Act of May 8, 1956, P. L. (1955) 1542, 31 PS §416, where under the heading "Milk law not to affect this Act", it is provided as follows:

"Section 10. (a) The provisions of this act shall not be construed to be impaired or in any way affected by the provisions of the act, approved the second day of July, one thousand nine hundred and thirty-five (Pamphlet Laws 589), entitled 'An act to safeguard human health and life by providing for the issuance of permits to, and regulation of persons and entities selling milk and milk products; conferring powers, and imposing duties on the Secretary of Health, the Advisory Health Board; and otherwise providing for the administration of the act; and imposing penalties,' or its amendments."

This provision is a clear recognition upon the part of the legislature that both laws are to be enforced and in effect and that they must be construed together. They complement each other and the purpose of each is to protect the public and to see that the public's health is safeguarded. The making of ice cream is but

one step in a long chain of events from the time the milk leaves the cow until it reaches the consumer, and not only must the ingredients which go into the making of ice cream be pure and healthful, but sanitary procedures and inspections must be followed from the very moment that the milk is produced by the cow in the barn.

Plaintiff here is seeking the intervention of a court of equity and asking for a preliminary injunction. We fail to see how it comes into court with clean hands, in view of the fact that it had operated under the Act of 1935 and knew of its provisions. In 1955, it sought no renewal of its milk products license and did not do so until July, 1957, when its employes were threatened with prosecution under the provisions of the Act of 1935. If it feels that it is right in its contention that its license under the Ice Cream Law is sufficient, it can readily test the law by having its employes submit to a criminal prosecution. The fact that it does an enormous ice cream business in Pennsylvania cannot be weighed against the health of the people of Pennsylvania, for it had the opportunity to avail itself of the protection of the law and for two years did not choose to do so. Plaintiff's ice cream is sold below the usual market price in Pennsylvania and that is due no doubt to the fact that Ohio law is not so particular as to inspections and sanitation and that the cost to plaintiff is lower than it would be in Pennsylvania. Hence its ability to undersell the Pennsylvania market. There are between 200 and 250 plants outside of Pennsylvania which sell milk for pasteurization to Pennsylvania permit holders and certainly plaintiff in a very short time can secure a Pennsylvania-approved source of supply. It admits that the chief source of the ingredients which go into the making of its ice cream comes from outside of Pennsylvania and that that

source does not conform to the standards set up by the Pennsylvania law. Its right to a preliminary injunction is far from clear. For these reasons, which we have set forth in detail, we now make the following

*Order*

And now, July 22, 1957, the application of plaintiff for a preliminary injunction herein is hereby refused.